1
2
3
4
5
6
7
8
9
10

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **HENRY CARTWRIGHT,**<br><br>                              Petitioner,<br><br>      **v.**<br><br>**ROBERT W. FOX, Warden,**<br><br>                              Respondent. | **Case No. 1:13-cv-00463 AWI MJS (HC)**<br><br>**FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS** |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Respondent, warden of California Medical Facility, Vacaville, is hereby substituted as the proper named respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. Respondent is represented by Max Feinstat of the office of the Attorney General.

**I.      PROCEDURAL BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his

1

1   conviction by jury trial on September 24, 2009, for torture, assault with a deadly weapon,

2   infliction of corporal injury resulting in a traumatic condition, criminal threats, and various

3   enhancements. (Clerk's Tr. at 463-64.) Petitioner was sentenced to an indeterminate

4   term of nineteen (19) years to life in state prison.  (Id.)

5           Petitioner filed a direct appeal with the California Court of Appeal, Fifth Appellate

6   District on December 30, 2010. (Lodged Doc. 1) The court affirmed the judgment on

7   October 27, 2011. (Lodged Doc. 4, People v. Cartwright, 2011 Cal. App. Unpub. LEXIS

8   8229 (Oct. 27, 2011).) On January 4, 2012, the California Supreme Court denied review.

9   (Lodged Doc. 6.)

10          Petitioner next sought collateral review by way of petitions for writ of habeas

11  corpus in state court. Petitioner first filed a habeas corpus petition with the Kern County

12  Superior Court on November 4, 2009. (Lodged Doc. 8.) The court denied the petition in a

13  written decision on December 29, 2009. (Lodged Doc. 9.) Petitioner then filed a second

14  habeas corpus petition with the Kern County Superior Court on May 17, 2010. (Lodged

15  Doc. 10.) The petition was denied on August 15, 2010. (Lodged Doc. 11.) Petitioner filed

16  a third habeas corpus petition with the Kern County Superior Court on August 20, 2010.

17  (Lodged Doc. 12.) The court denied the petition on October 1, 2010. (Lodged Doc. 13.)

18  Petitioner filed a fourth habeas corpus petition with the Kern County Superior Court on

19  June 28, 2011. (Lodged Doc. 14.) The court denied the petition on August 29, 2011.

20  (Lodged Doc. 15.) Petitioner filed a fifth habeas corpus petition with the Kern County

21  Superior Court on July 25, 2011. (Lodged Doc. 16.) The court denied the petition on

22  August 17, 2011. (Lodged Doc. 17.)

23          Petitioner then filed for habeas relief with the Fifth District Court of Appeal on

24  August 8, 2012. (Lodged Doc. 18.) Pursuant to Petitioner's request, the court dismissed

25  the petition on September 19, 2012. (Lodged Doc. 19.)

26          Finally Petitioner sought habeas review from the California Supreme Court. He

27  filed his first petition with the court on May 11, 2012. (Lodged Doc. 20.) The court denied

28  the petition on July 25, 2012. (Lodged Doc. 21.) Petitioner filed a second petition with the

1   California Supreme Court on March 21, 2013. (Lodged Doc. 22.) The court denied the

2   petition on May 22, 2013. (Lodged Doc. 23.)

3       Petitioner filed the instant federal habeas petition on March 29, 2013.  (Pet., ECF

4   No. 1.) On December 1, 2014, Petitioner filed an amended petition with the Court. (Am.

5   Pet., ECF No. 27.) Petitioner presents six claims for relief in the instant petition.

6   Petitioner alleges: (1) that there was insufficient evidence to support the convictions for

7   infliction of great bodily injury and torture based on the undetermined severity of the

8   burns suffered by the victim; (2) that the definition of great bodily injury under California

9   law is constitutionally vague; (3) that the trial court erred in failing to declare a mistrial

10   after the prosecution asked a question that informed the jury of Petitioner's past criminal

11   acts; (4) that Petitioner's right to effective assistance of counsel was violated; (5) that the

12   cumulative effect of errors committed at trial rendered the proceedings fundamentally

13   unfair; and (6) that Petitioner's sentence for his conviction for criminal threats should be

14   stayed, rather than run concurrently with the sentences from his other convictions. (Id. at

15   4-6.)   Respondent filed an answer to the petition on April 23, 2015. (ECF No. 38.)

16   Despite the fact that the answer was filed with the Court, Petitioner filed a motion for

17   court order granting habeas relief for Respondent's failure to answer the Petition on May

18   26, 2015.  (ECF No. 40.) Observing that Petitioner did not receive a copy of the answer,

19   Respondent served Petitioner with another copy of the answer on June 10, 2015. (ECF

20   No. 42.) Despite filing several motions for extension of time, Petitioner did not timely file

21   a traverse. Accordingly, the matter stands ready for adjudication.

22

23   **II.**    **STATEMENT OF THE FACTS**[1]

24       As of 2009, defendant and Kimberly D. had lived together in
Bakersfield for four years, but they were not married. They had two
25     children together; however, both children had been removed from their
custody and placed with Kimberly's mother, Sheila D. (Sheila). Kimberly
26

27   [1]The Fifth District Court of Appeal's summary of the facts in its October 27, 2011 opinion is presumed
correct.  28 U.S.C. § 2254(e)(1).

28

3

had two older children from prior relationships, both of whom had also been removed from her custody; one of those children also lived with Sheila.

Kimberly worked as an exotic dancer at "adult entertainment" clubs in Bakersfield and Southern California. Kimberly's relationship with her children and Sheila deteriorated as she continued to live with defendant and work as a dancer. Kimberly seldom called or saw her mother. Kimberly had received supervised weekly visitation rights with her two youngest children, but she repeatedly failed to visit them. On one occasion, she cancelled a scheduled visit and told Sheila that she did not want the children to see that she had a black eye. Kimberly eventually lost her parental rights to all her children.

**The voicemail recording**

On the evening of January 22, 2009, Sheila attended church with the children. When she left the service, she discovered that a voicemail message had been left on her cell phone a few hours earlier. The call had been placed to Sheila's cell phone from the landline telephone at Kimberly's apartment. Sheila listened to the message and heard screaming.

The voicemail recording did not consist of a conventional cell phone message. Instead, it recorded a chaotic and harrowing exchange between a man and a woman, as the man apparently attacked the woman with a hot clothes iron. Sheila testified the voices belonged to defendant and Kimberly.

As the recording began, defendant declared that he was going to get Kimberly and she was going to die. Kimberly insisted that she didn't want anyone else. Kimberly wailed and moaned that defendant was burning her with an iron. Defendant repeatedly said that she would "burn in hell," and "[t]his is your day." Kimberly cried and pleaded with defendant that she loved him. Defendant replied that she was lying, and that he warned her not to fool around. Kimberly again cried out that he was burning her with the iron, and he was burning her for nothing because she was not involved with someone else.

Defendant repeatedly declared that she was going to die that day. Kimberly pleaded with defendant to stop and again said that she loved him. Defendant said she was going to die, and he was going to burn her until she "cap[ped] out." Kimberly swore that she loved him and not someone else. Defendant replied: "Bitch, you hoe ass mother f*****." The recording ended abruptly.

**Kimberly's initial statements**

After Sheila listened to the voicemail recording, she saved it on her cell phone and called Kimberly to check on her welfare. Kimberly said she was okay and that the incident had occurred earlier that day. Kimberly said she could not talk because defendant was present. Kimberly promised to "take care" of the situation the next day. Sheila told Kimberly that she would report the incident to the police if Kimberly failed to do so.

4

### Kimberly arrives at Sheila's house

On January 23, 2009, Sheila called Kimberly but could not reach her. Sheila called the police and reported the previous day's incident. Later that day, a dispatch operator advised Sheila that a patrol car went to Kimberly's residence, and Kimberly had refused service.[fn2]

**FN2**: At trial, Kimberly testified that her mother sent the police to her apartment to check on her, and she told them that she was okay. Also at trial, Bakersfield Police Officer Pence testified that based on dispatch records, officers went to Kimberly's apartment to conduct a welfare check, they spoke with Kimberly, and she appeared to be okay. The officers who conducted the welfare check did not testify.

Late that evening, Kimberly and a girlfriend arrived at Sheila's house, and Kimberly asked to see her children. Kimberly had a sweater on her arm, and then took it off and complained the sweater was hurting her arm.

Sheila testified that Kimberly had burn marks on her face and arm. There was a "brown spot" on the left side of Kimberly's face and jaw in the shape and mark of a clothes iron. Kimberly's left arm was burned from her shoulder to the inside of her elbow in the triceps area. Sheila could see "the prints of an iron going up her arm," that were "pressed — like angles." Sheila testified the burn marks were raw, red, pink, and had pus on them. Kimberly had covered the burns with some type of ointment.

Kimberly told Sheila that she was going to Los Angeles for the weekend with her girlfriend. Kimberly said she couldn't work at the nightclub because of the burns, and she needed to get away from defendant. Kimberly promised to "take care" of the situation when she returned.

### Kimberly talks to the police

A few days later, Kimberly returned to Bakersfield but told her mother that she was not ready to talk to the police. On January 29, 2009, Kimberly finally said that she was ready, and Sheila and Kimberly filed a report with the police department about the assault.

Officer Pence interviewed Kimberly at Sheila's house. Sheila played the voicemail recording for Pence, and Kimberly was present and listened to it with them. Kimberly told Pence that the recorded voices belonged to defendant and herself. Kimberly said the incident started in her bedroom when she received a telephone call from her former boyfriend. Defendant became angry and they argued. Kimberly said defendant grabbed her by the hair and dragged her. Defendant held her on the ground, pinned down her left arm, and burned her with a hot iron. Kimberly said she repeatedly told defendant that she would call the police if he did not stop burning her. Defendant finally got off her and left the apartment. Kimberly told Pence that she was afraid of defendant.

Pence took several photographs of Kimberly's face and arm. Sheila testified that Kimberly's burns appeared to be "more healed" in Pence's photographs. Sheila explained the burns were more pink and covered with pus when she initially saw them the previous week.

**Defendant's arrest**

On the morning of January 30, 2009, several officers went to the apartment where defendant lived with Kimberly. The officers knocked, announced their presence, and called the apartment's telephone – but no one responded or answered. They entered the apartment through an open window and found defendant hiding in the bathtub.

Officer Pence advised defendant of the warnings pursuant to Miranda v. Arizona (1966) 384 U.S. 436, and the reason for his arrest. Defendant denied that he burned Kimberly, and claimed she was injured when she was in Los Angeles the previous week. Defendant added that Pence "didn't know, that [Pence] wasn't there and [defendant] was." Pence found an iron from the bedroom and showed it to defendant. Defendant said that "wasn't even the right iron" and claimed Kimberly had three irons.

After defendant was taken into custody, Officer Pence met with Kimberly, showed her the iron, and said that defendant claimed she had three irons. Kimberly said defendant burned her with that particular iron and it was the only one she owned. Pence testified the iron matched the "distinguished pattern inside the burn" on the back of Kimberly's arm.

**Kimberly's prosecution testimony**

Kimberly testified at trial as a rather uncooperative prosecution witness. By the time of trial, she had been in custody for three weeks because she had refused to appear in court and testify against defendant. Kimberly described defendant as her "husband," and said she was still involved in a relationship with him. Kimberly testified she was not a victim or witness to any crime, and defendant never did any "bad things" to her. Kimberly said Sheila did not like defendant, and Sheila was upset they did not pay her enough for taking care of the children.

Kimberly was asked to listen to the voicemail recording from her mother's cell phone. Kimberly said she did not recognize any of the voices, she never talked to a police officer about that message, and she never told her mother that defendant burned her. Kimberly said an officer never took photographs of her, but conceded that she was depicted in the pictures taken by Officer Pence.

Kimberly denied the scars on her arm were from an iron. Kimberly was shown the iron taken from her apartment, and said she had two or three other irons and that particular iron was the "expensive one." Kimberly claimed there were no similarities between that iron and the marks on her arm.

Kimberly offered a variety of explanations for the scars and marks on her body, and the recording left on Sheila's voicemail. Kimberly claimed she suffered the scars from "working" when she "[c]ame down wrong." Kimberly said she may have left the cordless telephone in her back pocket while defendant was on top of her, and she inadvertently hit an autodial key when they were "doing our stuff."

Kimberly further explained that she may have gotten the marks on

6

her body when she engaged in "[r]ole playing" as part of her "professional activities" with paying clients at her apartment. She may have used the cordless telephone for some of their "games," she recorded those activities, and she kept the recordings at her apartment. Sheila had a key to Kimberly's apartment, and Kimberly believed Sheila might have removed and tampered with some of the recordings.

### The prosecution's expert

Jeri Darr, a social worker, testified as the prosecution's expert about domestic violence and battered women's syndrome. Darr testified that a domestic violence victim often fails to report the abuse, and the reporting party is frequently a concerned family member, a neighbor, or someone who witnessed the violence. Darr further explained that a domestic violence victim was generally more candid about the relationship immediately after an incident of violence, primarily because she was still traumatized, scared, and angry about what happened. It was also extremely common for a domestic violence victim to later recant and deny that she had suffered any injuries. It was not unusual for a victim to deny the incident happened even when confronted with the recording of her initial report.

## DEFENSE EVIDENCE

### Kimberly's defense testimony

Kimberly also testified as a cooperative defense witness and gave additional conflicting statements about the scars on her body and the source of the voicemail recording. Kimberly claimed she had multiple injuries on her body from falling off the stage while working as a dancer. Kimberly also claimed the scars might have been caused by Richard Arvizu, who had been her "boss" at a telephone escort service. Kimberly said that on January 17, 2009, she was in an altercation with Arvizu and she was "positive" that he burned her with a flat iron and inflicted the scars. Kimberly explained she could not accurately remember anything that happened in January 2009 because she was "high" on drugs and that time was "very foggy." However, she was certain that defendant did not inflict the injuries on her.

Kimberly testified that on January 22, 2009, the date of the alleged assault, she was not in Bakersfield because she was working at a club in Los Angeles. She left "Mercedes" to watch her apartment while she was gone.

Kimberly admitted Sheila took her to the police station and told her to "be ready" to talk. Kimberly claimed that Sheila wanted her to lie about defendant so Sheila could keep defendant away from the children. Sheila promised Kimberly that she could see the children more often if defendant "went away."

### Additional defense evidence

Timothy Harlston, defendant's cousin, testified that he went to Kimberly's apartment on January 22, 2009, the day of the alleged assault, because he was looking for defendant. "Mercedes" was there, and she said that Kimberly was out of town. Harlston testified that Sheila arrived at

Kimberly's apartment and appeared to be looking for something. Sheila went into Kimberly's room and left with a bag. Harlston never saw defendant or Kimberly that day.

Haliki Green testified that he had known defendant and Kimberly for many years. Green worked in the adult entertainment industry as a dancer and actor in pornographic movies. He was in custody on an unrelated matter, and he had a prior conviction for giving false information to the police.

Green testified he worked with Kimberly in January 2009, they engaged in some adult role-playing activities, and things got "a little rough." These activities were both audio and videotaped. Green testified Kimberly's voice was on the voicemail recording, but defendant was not the male voice, and he refused to identify the man. Green testified Richard Arvizu was probably the producer of that tape. Green explained Arvizu was a rough operator, the participants in his productions were usually injured, and his work could have involved burning.[fn3]

**FN3**: Green had been in custody prior to trial, and claimed that someone from the district attorney's office offered him a deal if he testified against defendant. The prosecutor's investigator testified the jail logs showed that Green was visited by the defense investigator, but there was no evidence that he was visited by anyone associated with the prosecution.

**Convictions and sentence**

Defendant was charged and convicted of count II, torture; count III, assault with a deadly weapon, an electric iron; count IV, infliction of corporal injury resulting in a traumatic condition; and count V, criminal threats. As to counts III and IV, the jury found defendant inflicted great bodily injury under circumstances involving domestic violence (§ 12022.7, subd. (e)). As to count IV, the jury found defendant personally used a deadly weapon, an iron, in the commission of the offense (§ 12022, subd. (b)(1)). The court found he had one prior serious felony conviction (§ 667, subd. (a)), and one prior strike conviction (§ 667, subds. (b)-(i)).

Defendant was also charged with count I, attempted murder (§§ 664, 187), but he was found not guilty of that offense and not guilty of the lesser included offense of attempted voluntary manslaughter.

Defendant was sentenced to the second strike term of 14 years to life for count II, torture, plus a consecutive term of five years for the prior serious felony conviction. The remaining terms and enhancements were either imposed concurrently or stayed.

People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229, 1-14 (Oct. 27, 2011).


III.    **DISCUSSION**

A.    **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in

1   custody pursuant to the judgment of a state court if the custody is in violation of the

2   Constitution or laws or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. §

3   2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000).  Petitioner asserts that he

4   suffered violations of his rights as guaranteed by the U.S. Constitution.   (Pet.)   In

5   addition, the conviction challenged arises out of the Kern County Superior Court, which

6   is located within the jurisdiction of this court. 28 U.S.C. § 2241(d); 2254(a).  Accordingly,

7   this Court has jurisdiction over the instant action.

8   **B.**   **Legal Standard of Review**

9   On April 24, 1996, Congress enacted the Antiterrorism and Effective Death

10  Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus

11  filed after its enactment.  Lindh v. Murphy, 521 U.S. 320, 326 (1997); Jeffries v. Wood,

12  114 F.3d 1484, 1499 (9th Cir. 1997).  The instant petition was filed after the enactment

13  of the AEDPA and is therefore governed by AEDPA provisions.

14  Under AEDPA, a person in custody under a judgment of a state court may only be

15  granted a writ of habeas corpus for violations of the Constitution or laws of the United

16  States.  28 U.S.C. § 2254(a); Williams, 529 U.S. at 375 n. 7.  Federal habeas corpus

17  relief is available for any claim decided on the merits in state court proceedings if the

18  state court's adjudication of the claim:

19  (1) resulted in a decision that was contrary to, or involved an
20  unreasonable application of, clearly established federal law, as
    determined by the Supreme Court of the United States; or

21  (2) resulted in a decision that was based on an unreasonable
22  determination of the facts in light of the evidence presented in the State
    court proceeding.

23  28 U.S.C. § 2254(d).

24  1.   Contrary to or an Unreasonable Application of Federal Law

25  A state court decision is "contrary to" federal law if it "applies a rule that

26  contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts

27  that [are] materially indistinguishable from [a Supreme Court case] but reaches a

28  different result."  Brown v. Payton, 544 U.S. 133, 141 (2005) (citing Williams, 529 U.S. at

405-06).  "AEDPA does not require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied . . . The statute recognizes . . . that even a general standard may be applied in an unreasonable manner."  Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (citations and quotation marks omitted).  The "clearly established Federal law" requirement "does not demand more than a 'principle' or 'general standard.'"  Musladin v. Lamarque, 555 F.3d 830, 839 (2009).  For a state decision to be an unreasonable application of clearly established federal law under § 2254(d)(1), the Supreme Court's prior decisions must provide a governing legal principle (or principles) to the issue before the state court.  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003).  A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable."  Id. at 75-76 (quoting Williams, 529 U.S. at 409-10); Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).  In Harrington v. Richter, the Court further stresses that "an *unreasonable* application of federal law is different from an *incorrect* application of federal law."  131 S. Ct. 770, 785 (2011) (citing Williams, 529 U.S. at 410) (emphasis in original).  "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision."  Id. at 786 (citing Yarborough v. Alvarado, 541 U.S. 653, 664 (2004)).  Further, "[t]he more general the rule, the more leeway courts have in reading outcomes in case-by-case determinations."  Id.; Renico v. Lett, 130 S. Ct. 1855, 1864 (2010).  "It is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1419 (2009) (quoted by Richter, 131 S. Ct. at 786).

> 2.    Review of State Decisions

"Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds."  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).  This is referred to as the "look through" presumption.  Id. at 804; Plascencia v. Alameida, 467 F.3d 1190, 1198

1   (9th Cir. 2006).   Determining whether a state court's decision resulted from an

2   unreasonable legal or factual conclusion, "does not require that there be an opinion from

3   the state court explaining the state court's reasoning."   Richter, 131 S. Ct. at 784-85.

4   "Where a state court's decision is unaccompanied by an explanation, the habeas

5   petitioner's burden still must be met by showing there was no reasonable basis for the

6   state court to deny relief."   Id.   "This Court now holds and reconfirms that § 2254(d) does

7   not require a state court to give reasons before its decision can be deemed to have been

8   'adjudicated on the merits.'"   Id.

9          Richter instructs that whether the state court decision is reasoned and explained,

10   or merely a summary denial, the approach to evaluating unreasonableness under §

11   2254(d) is the same: "Under § 2254(d), a habeas court must determine what arguments

12   or theories supported or, as here, could have supported, the state court's decision; then

13   it must ask whether it is possible fairminded jurists could disagree that those arguments

14   or theories are inconsistent with the holding in a prior decision of this Court."   Id. at 786.

15   Thus, "even a strong case for relief does not mean the state court's contrary conclusion

16   was unreasonable."   Id. (citing Lockyer v. Andrade, 538 U.S. at 75).   AEDPA "preserves

17   authority to issue the writ in cases where there is *no possibility* fairminded jurists could

18   disagree that the state court's decision conflicts with this Court's precedents."   Id.

19   (emphasis added).   To put it yet another way:

20          As a condition for obtaining habeas corpus relief from a federal
21          court, a state prisoner must show that the state court's ruling on the claim
          being presented in federal court was so lacking in justification that there
          was an error well understood and comprehended in existing law beyond
22          any possibility for fairminded disagreement.

23   Id. at 786-87.   The Court then explains the rationale for this rule, i.e., "that state courts

24   are the principal forum for asserting constitutional challenges to state convictions."   Id. at

25   787.   It follows from this consideration that § 2254(d) "complements the exhaustion

26   requirement and the doctrine of procedural bar to ensure that state proceedings are the

27   central process, not just a preliminary step for later federal habeas proceedings."   Id.

28   (citing Wainwright v. Sykes, 433 U.S. 72, 90 (1977)).

### 3. Prejudicial Impact of Constitutional Error

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 121-22 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness). Some constitutional errors, however, do not require that the petitioner demonstrate prejudice. See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).

## IV. **REVIEW OF PETITION**

### A. **Claim One: Unlawful Coersion of the Jury**

Petitioner, in his first claim for relief, asserts that there was insufficient evidence to support his convictions for torture and infliction of great bodily injury.

#### 1. Legal Standard

The Fourteenth Amendment's Due Process Clause guarantees that a criminal defendant may be convicted only by proof beyond a reasonable doubt of every fact necessary to constitute the charged crime. Jackson v. Virginia, 443 U.S. 307, 315-16, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under the Jackson standard, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S. at 319 (emphasis in original).

In applying the Jackson standard, the federal court must refer to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16. A federal court sitting in habeas review is "bound to accept a state court's interpretation of state law, except in the highly unusual case in which the interpretation is clearly untenable and amounts to a subterfuge to avoid federal review of a constitutional violation." Butler v. Curry, 528 F.3d 624, 642 (9th Cir. 2008) (quotation omitted).

2.     State Court Decision

Petitioner presented this claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the appellate court and summarily denied in a subsequent petition for review by the California Supreme Court. Applying the look through doctrine, (Ylst v. Nunnemaker, 501 U.S. at 804-05 & n.3), the California Court of Appeal explained:

**I. Substantial evidence of torture and great bodily injury**

Defendant contends there is insufficient evidence to support his conviction in count II for torture and for the great bodily injury enhancements for count III, assault with a deadly weapon, and count IV, infliction of corporal injury. Defendant argues that Kimberly's burns did not constitute the type of great bodily injuries contemplated by those statutes, she did not need to seek medical attention for the burns, and there is no evidence that she was physically impaired by the burns.

"In assessing the sufficiency of the evidence, we review the entire record in the light most favorable to the judgment to determine whether it discloses evidence that is reasonable, credible, and of solid value such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] Reversal on this ground is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (People v. Bolin (1998) 18 Cal.4th 297, 331.)

**A. Torture**

We begin with defendant's conviction in count II for torture in violation of section 206, which states:

"Every person who, with the intent to cause cruel or extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose, inflicts great bodily injury as defined in Section 12022.7 upon the person of another, is guilty of torture. [¶ ] The crime of torture does not require any proof that the victim suffered pain."As we will explain below, section 12022.7, subdivision (f) defines great bodily injury as "a significant or substantial physical injury."

Torture, as defined in section 206, "focuses on the mental state of the perpetrator and not the actual pain inflicted" on the victim. (People v. Hale (1999) 75 Cal.App.4th 94, 108 (Hale).) Section 206 does not require permanent, disabling, or disfiguring injuries, or proof that the victim suffered pain. (People v. Pre (2004) 117 Cal.App.4th 413, 420 (Pre).) Instead, section 206 only requires great bodily injury, as defined in section 12022.7. (Ibid.)

In addition, section 206 does not require that the defendant intend to inflict prolonged pain. The brevity of an attack does not foreclose a

defendant's conviction for torture. (<u>People v. Massie</u> (2006) 142 Cal.App.4th 365, 371; <u>Pre</u>, supra, 117 Cal.App.4th at p. 420; <u>Hale</u>, supra, 75 Cal.App.4th at pp. 107-108.) The length of time over which the offense occurred, and the severity of the wounds inflicted, are relevant factors but not necessarily determinative. (<u>People v. Massie</u>, supra, 142 Cal.App.4th at p. 371.)

## B. Great bodily injury

As to count III, assault with a deadly weapon, an electric iron, and count IV, infliction of corporal injury resulting in a traumatic condition, the jury found defendant inflicted great bodily injury on the victim under circumstances involving domestic violence pursuant to section 12022.7, subdivision (d).

Section 12022.7, subdivision (f) defines great bodily injury, for purposes of the enhancement and section 206's definition of torture, as "a significant or substantial physical injury." As with torture, in order to constitute great bodily injury for the enhancement, there is no requirement that "the victim suffer 'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily function." (<u>People v. Escobar</u> (1992) 3 Cal.4th 740, 750 (<u>Escobar</u>).) "[S]ignificant or substantial [means] not insignificant, trivial or moderate. [Citations.]" (<u>People v. Armstrong</u> (1992) 8 Cal.App.4th 1060, 1066.) "Abrasions, lacerations, and bruising can constitute great bodily injury. [Citation.]" (<u>People v. Jung</u> (1999) 71 Cal.App.4th 1036, 1042 (<u>Jung</u>).)

The determination of whether a victim has suffered physical harm amounting to great bodily injury is not a question of law for the court but a factual inquiry to be resolved by the jury. (<u>People v. Cross</u> (2008) 45 Cal.4th 58, 64 (<u>Cross</u>).) "'"If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though the circumstances might reasonably be reconciled with a contrary finding."' [Citation.]" (<u>Escobar</u>, supra, 3 Cal.4th at p. 750.) "'"A fine line can divide an injury from being significant or substantial from an injury that does not quite meet the description."' [Citations.] Where to draw that line is for the jury to decide." (<u>Cross</u>, supra, 45 Cal.4th at p. 64.)

## C. Analysis

There is overwhelming evidence to support the jury's finding that Kimberly suffered great bodily injury and to support both count II and the enhancements based on the burns defendant inflicted on her face and arm. Sheila personally observed the burns the day after the assault and described a brown mark on Kimberly's face, which was in the shape and mark of an iron. Sheila also described burns on Kimberly's left arm from the shoulder to the inside of her elbow in the triceps area. Sheila could see "the prints of an iron going up her arm," that were "pressed ... like angles." Sheila testified the burn marks were raw, red, pink, and had pus on them. The jury also saw Officer Pence's photographs of the burns, which were taken about a week after the assault, and Sheila's explanation that the burns appeared "more healed" in those photographs.

Moreover, the jury heard the stark and disturbing voicemail recording from Sheila's cell phone, which documented defendant's assault on Kimberly with the iron. Kimberly cried, moaned, and wailed in pain as

14

defendant repeatedly burned her with the iron and said he was going to kill her. The very nature and distinctive pattern of these repetitive burns indicates the force with which defendant pressed the iron on her body, and refutes any inference that the injuries were from glancing or minimal contacts. No rational jury could find that burning a person's face and arm multiple times with a hot iron would not inflict great bodily injury.

Defendant cites several cases involving injuries more grievous and life-threatening than the burns he inflicted on Kimberly's face and arm, and argues that there is insufficient evidence that she suffered great bodily injury compared to these other cases. Defendant's argument lacks merit. First, "'[w]hen we decide issues of sufficiency of evidence [in a torture case], comparison with other cases is of limited utility, since each case necessarily depends on its own facts.' [Citation.]" (People v. Baker (2002) 98 Cal.App.4th 1217, 1225.) "That other victims of torture may have suffered more than the victim in this case sheds no light on the sufficiency of the evidence ...." (Jung, supra, 71 Cal.App.4th 1036, 1043.) There is "little utility in looking to the facts of other torture cases when faced with assessing the sufficiency of the evidence. [Citations.]" (Pre, supra, 117 Cal.App.4th at p. 423.) "Thus, the fact that [defendant] did not inflict more severe or additional injuries ... does not undermine a conclusion the evidence was sufficient in this case." (Ibid.) While Kimberly's injuries may not have been as severe as in the cases cited by defendant, the jury could reasonably find the series of burns to her face and arm, inflicted by a hot iron with enough force to leave the distinctive burn patterns, constituted great bodily injury within the meaning of section 12022.7.

Defendant asserts there is conflicting evidence as to the severity of Kimberly's burns based on the fact that officers conducted a welfare check on her the day after the assault and the officers reported that she was okay. Defendant argues that these officers would not have discontinued the welfare check if they had observed severe burns on her face and arm. Defendant is correct that there was conflicting evidence regarding the welfare check, which was triggered by Sheila's concern that Kimberly was not answering her cell phone on the day after the assault. Sheila testified that the dispatch operator advised her that officers went to Kimberly's residence and she had refused service. At trial, Officer Pence testified the dispatch logs reflected that the officers believed she was okay. Also at trial, Kimberly testified that she told the police that she was okay.

The entirety of the record strongly suggests that Kimberly may have successfully downplayed the serious nature of the iron burns when the officers conducted the welfare check. On the night of the assault, Kimberly repeatedly told Sheila not to call the police. Several hours after the welfare check, Kimberly arrived at Sheila's house and a sweater covered the burns on her arm. Kimberly again told Sheila not to call the police, and said she was not ready to report the incident. The officers who actually conducted the welfare check did not appear at trial, and there is no evidence if they made face-to-face contact with Kimberly, or whether they were able to clearly observe her face and arm without any obstructions. The fact that the officers discontinued the welfare check does not undermine Sheila's observations of the burns the day after the assault, or the nature of the injuries depicted in Officer Pence's photographs taken a week after the assault.

Defendant further argues that in contrast to other published torture

1
2
3
4
5
6

cases, there is insufficient evidence of great bodily injury because Kimberly did not seek medical treatment for her burns and there is no evidence that she suffered any physical impairment. Defendant correctly notes that proof that a victim suffered great bodily injury "is commonly established by evidence of the severity of the victim's physical injury, the resulting pain, or the medical care required to treat or repair the injury. [Citations.]" (Cross, supra, 45 Cal.4th at p. 66.) However, in People v. Lopez (1986) 176 Cal.App.3d 460, there was substantial evidence of great bodily injury where one victim was shot in the buttocks and the other victim was shot in the thigh, and neither victim sought or received medical attention. (Id. at pp. 464-465.) Thus, the victim's failure to seek medical assistance does not foreclose a jury's finding of great bodily injury.

7
8
9
10

As explained ante, the jury is charged with drawing the line between mere injury and great bodily injury. (Escobar, supra, 3 Cal.4th at p. 752.) The jury in this case was presented with sufficient evidence that defendant inflicted great bodily injury on Kimberly when he repeatedly burned her face and arm with a hot iron, and his conviction in count II for torture, and the jury's findings on the great bodily injury enhancements for counts III and IV, are supported by substantial evidence.

11   People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229 at 14-23.

12                               b.      Analysis

13   Petitioner asserts that there was insufficient evidence to support a finding of 'great

14   bodily injury,' a required element to support the conviction for torture and the great bodily

15   injury enhancement. Petitioner acknowledges that the victim suffered injuries from the

16   hot iron that were observed by Sheila the day after the incident, and photographed by

17   the police roughly a week later. Petitioner contends that the fact that the victim did not

18   seek professional medical treatment, and treated the wounds herself with some ointment

19   shows that the wounds were not significant or substantial. Petitioner contends that there

20   was little evidence of the victim complaining of pain from the injuries, and argues that

21   while the victim was not allowed to work as an exotic dancer due to the injuries, it was

22   likely based on her appearance rather than any physical impairment from the injuries.

23   At the time of Petitioner's conviction, California defined great bodily injury as "a

24   significant or substantial physical injury." Cal. Penal Code § 12022.7. Great bodily injury

25   is commonly established by evidence of the severity of the victim's physical injury, the

26   resulting pain, or the medical care required to treat or repair the injury. Id.; People v.

27   Cross, 45 Cal.4th 58, 63, 66, 82 Cal. Rptr. 3d 373, 190 P.3d 706 (2008). For there to be

28   a significant or substantial physical injury, it is not necessary for "the victim to suffer

1   'permanent,' 'prolonged' or 'protracted' disfigurement, impairment, or loss of bodily

2   function." People v. Escobar, 3 Cal.4th 740, 750, 12 Cal. Rptr. 2d 586, 837 P.2d 1100

3   (1992).

4         Petitioner's arguments are unpersuasive. While medical treatment can be one

5   factor that is used to determine the severity of the injury, the fact that a victim did not

6   seek treatment is not determinative of whether great bodily injury occurred. Petitioner

7   also contends that the victim did not complain about the injuries.  However, during the

8   voicemail recording the victim was heard "wail[ing] and moan[ing]" and otherwise crying

9   out in pain when she was being burned. The day after the incident, the victim

10  complained of pain, and removed a sweater she was wearing because of the burn

11  wounds on her arm.

12        Further, there was ample evidence upon which the jury could have relied to prove

13  that the victim suffered significant or substantial physical injuries. The phone recording

14  depicted the cries of pain of the victim when she was being burned by Petitioner.

15  Evidence from Shelia regarding the state of the burn wounds the day after the injury

16  indicated that Petitioner suffered burns on significant portions of her body and that the

17  burns were raw, red and pink and actively discharging. Finally, there were photographs

18  of the burns to the victim's face and arm taken by the police roughly a week after the

19  incident. Based on the extent and severity of the burns inflicted upon the victim, it is

20  without question that there was ample evidence to support the jury's finding that burns

21  constituted great bodily injury as defined by California law.

22        The evidence viewed in the light most favorable to the prosecution and with

23  appropriate deference provided by federal habeas review supports the jury's finding of

24  the conviction for torture and the enhancement based on great bodily injury. Under

25  Jackson and AEDPA, the state decision is entitled to double deference on habeas

26  review. Based on the Court's independent review of the trial record, it is apparent that

27  Petitioner's challenge to the jury finding that the victim suffered great bodily injury is

28  without merit. There was no constitutional error, and Petitioner is not entitled to relief with

1    regard to this claim.

2          **B.**    **Claim Two: Great Bodily Injury Statute is Unconstitutionally Vague**

3          Petitioner, in his second claim, contends that the definition of great bodily injury

4    under California State law is unconstitutionally vague because it fails to provide sufficient

5    certainty for the jury to decide whether a victim's injuries are significant.

6                1.    State Court Decision

7          Petitioner presented his claim by way of direct appeal to the California Court of

8    Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the

9    Court of Appeal (People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229) and in a

10   subsequent petition for review filed with California Supreme Court. As stated earlier,

11   "where there has been one reasoned state judgment rejecting a federal claim, later

12   unexplained orders upholding that judgment or rejecting the claim rest on the same

13   grounds." See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991). This is referred to as the

14   "look through" presumption. Id. at 804. Since the Court of Appeal was the last court to

15   issue a reasoned opinion on these issues, this Court "looks through" the California

16   Supreme Court decision to the reasoned analysis of the Court of Appeal.

17         With regard to the unconstitutionally vague claim, the Court of Appeal said in its

18   opinion:

19              **II. The definition of great bodily injury is not unconstitutionally**
                **vague**
20

21              Defendant next contends the definition of great bodily injury
           contained within section 12022.7, subdivision (f) is unconstitutionally
22         vague because it fails to provide sufficient certainty for the jury to decide
           whether any victim's injuries, and particularly Kimberly's injuries in this
           case, are significant or substantial.
23

24              As defendant concedes, similar constitutional challenges to section
           12022.7's definition of great bodily injury, as applied to both the
25         enhancement and section 206's definition of torture, have been repeatedly
           rejected. (People v. Guest (1986) 181 Cal.App.3d 809, 811-812; In re
26         Mariah T. (2008) 159 Cal.App.4th 428, 436-437; People v. Lewis (2004)
           120 Cal.App.4th 882, 888-889; People v. Misa (2006) 140 Cal.App.4th
27         837, 844; People v. Albritton (1998) 67 Cal.App.4th 647, 656-657; People
           v. Aguilar (1997) 58 Cal.App.4th 1196, 1200, 1204-1205; see also James
28         v. United States (2007) 550 U.S. 192, 210-211, fn. 6 [relying in part on
           California law to reject argument that the phrase "serious potential risk of

physical injury" is unconstitutionally vague].)

> Defendant argues the statutory definition is unconstitutionally vague as applied to this particular case given the nature of Kimberly's burns, particularly since she did not seek medical treatment. As we have explained, however, whether a victim has suffered physical harm amounting to great bodily injury is a factual question to be resolved by the jury. (Cross, supra, 45 Cal.4th 58, 64.) In this case, the jury heard Sheila's extensive description of the nature of Kimberly's facial and arm burns based on Sheila's observations the day after the attack, listened to the voicemail recording of Kimberly's cries and moans during the actual assault, and reviewed Officer Pence's photographs of the burns, which were taken one week after the attack. We reject defendant's contention that the jury could not understand what conduct is prohibited by section 206 and section 12022.7, subdivision (f). We decline to find the definition of great bodily injury is unconstitutionally vague in the abstract or as applied to the instant case. (People v. Misa, supra, 140 Cal.App.4th at p. 844.)

People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229, at 23-25.

> 2.    Legal Standards

A state criminal statute may be challenged as unconstitutionally vague by way of a petition for a writ of habeas corpus by a prisoner convicted under the statute. See Vlasak v. Superior Court of California, 329 F.3d 683, 688-90 (9th Cir. 2003). Outside the First Amendment context, a petitioner alleging facial vagueness must show that "the enactment is impermissibly vague in all its applications." Hotel & Motel Ass'n of Oakland v. City of Oakland, 344 F.3d 959, 972 (9th Cir. 2003) (quoting Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495, 102 S. Ct. 1186, 71 L. Ed. 2d 362 (1982)); Humanitarian Law Project v. United States Treasury Dept., 578 F.3d 1133 (9th Cir. 2009). Additionally, "[u]nless First Amendment freedoms are implicated, a vagueness challenge may not rest on arguments that the law is vague in its hypothetical applications, but must show that the law is vague as applied to the facts of the case at hand." United States v. Johnson, 130 F.3d 1352, 1354 (9th Cir. 1997) (citing Chapman v. United States, 500 U.S. 453, 467, 111 S. Ct. 1919, 114 L. Ed. 2d 524 (1991)).

"To satisfy due process, 'a penal statute [must] define the criminal offense (1) with sufficient definiteness that ordinary people can understand what conduct is prohibited; and (2) in a manner that does not encourage arbitrary and discriminatory enforcement.'" Skilling v. United States, 130 S.Ct. 2896, 2927-28, 177 L. Ed. 2d 619

1   (2010) (quoting Kolender v. Lawson, 461 U.S. 352, 357, 103 S. Ct. 1855, 75 L. Ed. 2d

2   903 (1983)); United States v. Kilbride, 584 F.3d 1240, 1256-57 (9th Cir. 2009) (even

3   under heightened standards of clarity for statutes involving criminal sanctions, "due

4   process does not require impossible standards of clarity"); see also Maynard v.

5   Cartwright, 486 U.S. 356, 361, 108 S. Ct. 1853, 100 L. Ed. 2d 372 (1988) ("[o]bjections

6   to vagueness under the Due Process Clause rest on lack of notice, and hence may be

7   overcome in any specific case where reasonable persons would know that their conduct

8   is at risk").

9       A criminal statute is unconstitutionally vague when it "fails to give a person of

10  ordinary intelligence fair notice that his contemplated conduct is forbidden by the

11  statute." United States v. Harriss, 347 U.S. 612, 617, 74 S. Ct. 808, 98 L. Ed. 989

12  (1954); see also United States v. Batchelder, 442 U.S. 114, 123, 99 S. Ct. 2198, 60 L.

13  Ed. 2d 755 (1979). A statute will meet the certainty required by the Constitution if its

14  language conveys sufficiently definite warning as to the proscribed conduct when

15  measured by common understanding and practices. See Panther v. Hames, 991 F.2d

16  576, 578 (9th Cir. 1993); see also, e.g., Holder v. Humanitarian Law Project, 130 S.Ct.

17  2705, 2719-21, 177 L. Ed. 2d 355 (2010) (finding statutory terms "training," "expert

18  advice or assistance," "service," and "personnel" in federal statute prohibiting knowingly

19  providing material support to a foreign terrorist organization provide fair notice because

20  they do not require "untethered, subjective judgments"); United States v. Rodriguez,

21  360 F.3d 949, 954 (9th Cir. 2004) (Hobbs Act's definition of commerce is well-

22  established and therefore not unconstitutionally vague); Houston v. Roe, 177 F.3d 901,

23  907-08 (9th Cir. 1999) (California's non-capital first degree murder by lying in wait

24  statute is not vague because it applies to slightly different conduct than capital murder

25  with the special circumstance of lying in wait and therefore the two statutes do not

26  encourage discriminatory or arbitrary enforcement).

27      In assessing whether a state statute is unconstitutionally vague, federal courts

28  must look to the plain language of the statute, as well as consider state courts'

constructions of the challenged statute. See Kolender, 461 U.S. at 355; see also United States v. Lanier, 520 U.S. 259, 266, 117 S. Ct. 1219, 137 L. Ed. 2d 432 (1997) (noting that judicial opinions may clarify "an otherwise uncertain statute"); Nunez by Nunez v. City of San Diego, 114 F.3d 935, 941-42 (9th Cir. 1997). The federal court is not bound by the state court's analysis of the constitutional effect of that construction, however. See Nunez, 114 F.3d at 942. Nevertheless, it must accept a narrow construction to uphold the constitutionality of a state statute if its language is readily susceptible to it. See id.

When a term has a well-settled common law meaning, it will not violate due process "'notwithstanding an element of degree in the definition as to which estimates might differ.'" Panther, 991 F.2d at 578 (quoting Connally v. General Constr. Co., 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926)). For example, the fact that a penal statute requires a jury upon occasion to determine a question of reasonableness is not sufficient to make it too vague to afford a practical guide to permissible conduct. See id. at 578-80 (use of "substantial risk" and "gross deviation" to define prohibited conduct did not make Alaska criminal negligence statute unconstitutionally vague) (quoting United States v. Ragen, 314 U.S. 513, 523, 62 S. Ct. 374, 86 L. Ed. 383 (1942)).

To avoid a vagueness challenge based on the potential for arbitrary enforcement, statutes must include "minimal guidelines to govern law enforcement." Kolender, 461 U.S. at 358; see also City of Chicago v. Morales, 527 U.S. 41, 60, 119 S. Ct. 1849, 144 L. Ed. 2d 67 (1999). "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections." Kolender, 461 U.S. at 358.

In Kolender, the Supreme Court declared unconstitutionally vague a California anti-loitering statute requiring persons loitering or wandering the streets to provide a "credible and reliable" identification and to account for their presence upon police request. 461 U.S. at 358-59. Although the law was deemed to violate the Due Process Clause of the Fourteenth Amendment because it failed to define what was meant by

1  "credible and reliable," the Kolender Court also noted its concern that the challenged

2  statute had the potential to suppress First Amendment rights. See id. at 357-63.

3        The petitioner in Kolender had been arrested fifteen times for disorderly conduct,

4  prosecuted twice, and convicted once, under a California statute which provided that an

5  individual had committed the offense if, he "loiters or wanders upon the streets or from

6  place to place without apparent reason or business and who refuses to identify himself

7  and to account for his presence when requested by any peace officer to do so, if the

8  surrounding circumstances are such as to indicate to a reasonable man that the public

9  safety demands such identification." Id. (citing Cal. Penal Code § 647(e)). The Supreme

10  Court was concerned that by affording so much discretion to police in determining

11  whether a suspect violated the anti-loitering law, the statute "furnishe[d] a convenient

12  tool for harsh and discriminatory enforcement by local prosecuting officials, against

13  particular groups deemed to merit their displeasure." Id. at 359. The Court noted that

14  the void-for-vagueness doctrine focuses not only on notice, but on whether the

15  "legislature establish[ed] minimal guidelines to govern law enforcement." Id. at 358.

16  Ultimately, the Kolender Court held that the state statute was unconstitutionally vague

17  on its face because it "encourage[d] arbitrary enforcement by failing to describe with

18  sufficient particularity what a suspect must do in order to satisfy the statute." Id. at 361.

19        3.    Analysis

20        The state appellate court's decision that the statute was not unconstitutionally

21  vague was neither contrary to, nor an unreasonable application of, clearly established

22  federal law, because California Penal Code § 12022.7 includes "minimal guidelines" to

23  govern those who apply the law. See Kolender, 461 U.S. at 358. As described above,

24  the statute defines "great bodily injury" to include only "significant or substantial physical

25  injury." Additionally, California's "great bodily injury" standard jury instructions, as

26  substantially given in this case, explain that insignificant, minor, or even moderate

27  injuries do not constitute great bodily injury. (See Rep. Tr. at 1435; see also CALCRIM

28  3160.) It was reasonable for the state court to conclude that these definitions provide

1    sufficient guidelines for juries to follow. See Kolender, 461 U.S. at 358.

2         It was not unreasonable for the California Court of Appeal to consider its own

3    case law in assessing whether the statute was unconstitutionally vague, or the common

4    usage and acceptance of the phrase "great bodily injury." See Panther, 991 F.2d at 578;

5    see also, e.g., Humanitarian Law Project, 130 S.Ct. at 2719-21. In fact, in assessing

6    whether a state statute is unconstitutionally vague, federal courts must consider state

7    courts' constructions of the challenged statute. See Kolender, 461 U.S. at 355; see also

8    Lanier, 520 U.S. at 266. The Court notes that numerous California appellate courts have

9    repeatedly rejected the very challenge Petitioner raises here, and the state court

10   decisions cited by the appellate court in this case are not contrary to the United

11   Supreme Court's decision in Kolender.

12        Additionally, the California Court of Appeal's decision that the definition of great

13   bodily injury under § 12022.7 as applied in this case was not unconstitutionally vague,

14   was not contrary to or an unreasonable application of clearly established federal law.

15   Under California Penal Code section 12022.7(f), Petitioner was on notice that causing

16   any "significant or substantial physical injury" would subject him to criminal liability.

17   Based on that definition, an ordinary person plainly could understand that assaulting

18   someone with a hot iron causing major burns to the victim would constitute prohibited

19   conduct. Moreover, given the victim's injuries in this case, the jury's finding of "great

20   bodily injury" cannot be deemed the result of its arbitrary exercise of personal

21   predilections. There was no constitutional error, and Petitioner is not entitled to relief

22   with regard to claim two.

23        **C.    Claim Three: Denial of Motion for Mistrial**

24        Petitioner, in his third claim, contends that the trial court erred in denying his

25   motion for mistrial based on the prosecutor's alleged misconduct in asking a question

26   that revealed Petitioner's criminal history.

27              1.    State Court Decision

28        Petitioner presented his claim by way of direct appeal to the California Court of

Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the Court of Appeal (People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229) and in a subsequent petition for review filed with California Supreme Court. As stated earlier, "where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. at 803-04. Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the prosecutorial misconduct claim, the Court of Appeal said in its opinion:

### III. Motion for mistrial/prosecutorial misconduct

Defendant next contends the court should have granted a motion for mistrial, which he made during Kimberly's defense testimony, when the prosecutor attempted to ask whether she knew defendant had been convicted of drug sales. Defendant asserts the prosecutor's question constituted misconduct, the court should have granted his motion for mistrial, and the question was prejudicial since it led the jury to believe he was a drug dealer. As we will explain, the entirety of the record indicates that defendant did not suffer any prejudice from the brief exchange between Kimberly and the prosecutor.

### A. Background

At trial, there were several instances where evidence was properly admitted regarding Kimberly's drug use. Sheila testified that Kimberly's children were removed from Kimberly's custody because she went into a drug treatment program.

Kimberly's drug use was again mentioned when she testified as an uncooperative prosecution witness. On cross-examination, Kimberly acknowledged that Sheila had custody of her children, and claimed Sheila was upset because defendant and Kimberly did not pay her enough money to take care of the children.

"[Defense counsel]: And [Sheila] is getting money because of your children; is that right? She gets it from the State and she gets it from you?

"[Kimberly]. Yeah. But the people don't know that.

"Q. I'm sorry?

"A. But the people don't know that. *They just know I'm a druggie*, so they say. But, yeah, she gets money from ...

them and me." (Italics added.)

When Kimberly testified for the defense, she explained that she could not accurately remember anything that happened in January 2009 because she was "high" on drugs and that time was "very foggy." On cross-examination, the prosecutor asked Kimberly about her drug use during that time compared to her condition during the trial. Kimberly testified she still used drugs, but "at that time .... I did more than now.

""[The prosecutor]: Do you get those drugs from [defendant]?

"A. No, I do not. He don't [sic] condone[] it.

"Q. *You're aware he's been convicted of drug sales*— - - - -" (Italics added.)

Defense counsel immediately objected. The court sustained the objection and the prosecutor moved on to a different topic.

Thereafter, outside the jury's presence, defense counsel moved for a mistrial and argued the prosecutor's question about defendant's alleged conviction for drug sales constituted improper impeachment and character evidence in violation of Evidence Code section 1101. Defense counsel argued the question was prejudicial and it would be impossible for the jury to acquit defendant because "they now think that what they have in front [of them] is a drug dealer ...."

The prosecutor argued that the question was appropriate. The court replied that the question was not appropriate "until you had leave of the Court to ask it, if you had requested it, which you did not." The prosecutor apologized, but argued that Kimberly opened the door to character evidence about defendant because she said that defendant did not condone drug use.

The court denied defendant's motion for mistrial:

"[T]he improper question was whether [Kimberly] was aware of the fact that [defendant had] been convicted of selling drugs. And that question was not answered by her. An objection was interposed. The objection was sustained. And we went on without further comment.

"I've instructed the jury already that questions are not evidence. That's all we have before the Court. We don't have an answer one way or the other. And the objection was sustained.

"And I don't think it rises to the level of a situation that would require this Court to mistry this case at this particular point in time or at any time, for that matter."

The court offered to further admonish the jury that the prosecutor's question was not evidence, but acknowledged such an instruction was "a two-edged sword" because it would call further attention to "something that we can't be too sure that the jury paid a whole lot of attention to ...." Defense counsel agreed that he did not want to call further attention to the

25

matter and declined an instruction.

## B. Analysis

"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's ... intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury."' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground — the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (People v. Samayoa (1997) 15 Cal.4th 795, 841.)

Defendant contends that the prosecutor's question about his conviction for selling drugs had no relationship to the domestic violence charges in this case. The record suggests otherwise. While Kimberly initially cooperated with the investigation, she had become an unwilling prosecution witness by the time of trial and insisted defendant never assaulted her. Kimberly readily admitted that she used drugs at the time of the assault, and that she continued to use drugs. The prosecutor may have sought to show a possible reason for Kimberly's dependence on defendant – that she relied on defendant to get her drugs – to explain why she had changed her story about the assault.

Defendant also contends that the prosecutor's question violated an existing court order, which purportedly excluded any evidence about defendant's prior drug activities. Defendant acknowledges that such an order is not contained in the record, but argues that this court can infer its existence based on the court's pretrial order which bifurcated the matter of defendant's prior convictions, and the court's chastisement of the prosecutor when she asked Kimberly about defendant's drug activities. While the court issued a standard bifurcation order prior to trial, there is no indication in the instant record that the court issued a specific pretrial order to exclude evidence of defendant's drug activities.

Nevertheless, the prosecutor's question was inappropriate because of the potentially prejudicial nature of the subject matter. The court properly admonished the prosecutor that she should have requested a ruling from the court before she asked the question. While the question may have been inappropriate under these circumstances, the court immediately sustained defense counsel's objection, and Kimberly never answered it. Contrary to the People's appellate arguments, defense counsel preserved the issue by objecting and moving for a mistrial. Counsel's decision not to accept the court's offer for a limiting instruction was an understandable tactical choice, and he did not waive appellate review of the matter.

Defendant argues the prosecutor's question was prejudicial, and he was convicted of the charged offenses because the jury was led to believe that he was a convicted drug dealer. However, the prosecutor's question was not prejudicial given the jury's verdicts in this case. The jury found defendant not guilty of the most serious charge in this case, attempted murder, and not guilty of the lesser included offense of attempted voluntary manslaughter. We are not persuaded that the jury was prejudicially influenced by the prosecution's question given the nature of the jury's verdicts in this case.

A motion for mistrial "should be granted only when a party's chances of receiving a fair trial have been irreparably damaged." (People v. Ayala (2000) 23 Cal.4th 225, 283.) We defer to the trial court's factual findings if they are supported by substantial evidence, and we review the court's denial of the mistrial motion for an abuse of discretion. (Id. at pp. 283, 299; People v. Batts (2003) 30 Cal.4th 660, 684-686.) We find the trial court did not abuse its discretion when it denied defendant's motion for mistrial since it promptly sustained defense counsel's objection and Kimberly never answered the question. We also find that any prosecutorial misconduct was not prejudicial given the entirety of the jury's verdicts in this case.

People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229 at 25-32.

2.    Applicable Legal Principles

A criminal defendant's due process rights are violated when a prosecutor's misconduct renders a trial fundamentally unfair. Parker v. Matthews, ___U.S. ___, 132 S.Ct. 2148, 2153, 183 L. Ed. 2d 32 (2012) (per curiam); Darden v. Wainwright, 477 U.S. 168, 181, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986). Claims of prosecutorial misconduct are reviewed "'on the merits, examining the entire proceedings to determine whether the prosecutor's [actions] so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Johnson v. Sublett, 63 F.3d 926, 929 (9th Cir. 1995) (citation omitted); see also Greer v. Miller, 483 U.S. 756, 765, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987); Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974); Towery v. Schriro, 641 F.3d 300, 306 (9th Cir. 2010). Relief on such claims is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice. Darden, 477 U.S. at 181-83. See also Towery, 641 F.3d at 307 ("When a state court has found a constitutional error to be harmless beyond a reasonable doubt, a federal court may not grant habeas relief unless the state court's determination is objectively unreasonable"). Prosecutorial misconduct violates

1   due process when it has a substantial and injurious effect or influence in determining the

2   jury's verdict. See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996).

3               3.   Analysis

4   Here, Petitioner objected to the prosecutor asking the victim whether she knew

5   that Petitioner had been previously convicted for drug sales. Specifically, Petitioner

6   asserts that the question was improper and prejudicial in light of an in limine ruling of the

7   trial court to prohibit such questioning without prior consent. As described, the conduct of

8   the prosecutor involved one inappropriate question. Further, the trial court noted that the

9   question was inappropriate based on the failure to ask the court's permission.

10   The California Court of Appeal examined Petitioner's prosecutorial misconduct

11   claims and determined that there was no prejudicial misconduct. The state court's

12   determination was not objectively unreasonable. See 28 U.S.C. § 2254(d). While the

13   prosecutor asked a question without authorization, defense counsel objected to the

14   question, and the witness never answered the question. Accordingly, no prejudicial

15   evidence was presented to the jury in relation to the question. Upon objection, the

16   prosecution apologized for the conduct and the trial court offered to provide a curative

17   instruction be provided to the jury. Defense counsel declined as to not draw further

18   attention to the issue. This does not suggest misconduct. In general, questioning does

19   not amount to a due process violation if the court instructs the jury not to consider the

20   prosecutor's questions. See Greer v. Miller, 483 U.S. 756, 766 n.8, 107 S. Ct. 3102, 97

21   L. Ed. 2d 618 (1987) (if curative instruction is given, reviewing court presumes that jury

22   disregarded inadmissible evidence and that no due process violation occurred); Trillo v.

23   Biter, 754 F.3d 1085, 1089 (9th Cir. 2014) ("We presume that juries listen to and follow

24   curative instructions from judges."). Further, the instance of misconduct about which

25   Petitioner complains was not so unfair as to constitute a due process violation. Towery v.

26   Schriro, 641 F.3d 300, 306 (9th Cir. 2010). The decision of the state appellate court

27   rejecting the claim of prosecutorial misconduct is not "so lacking in justification that there

28   was an error well understood and comprehended in existing law beyond any possibility

for fairminded disagreement." <u>Richter</u>, 131 S. Ct. at 786-87. Accordingly, Petitioner is not entitled to federal habeas relief on this claim.

### D.   Claim Four: Ineffective Assistance of Counsel

Petitioner, in his fourth claim, contends that the trial court erred in denying his motions to remove defense counsel during trial due to his ineffective representation.

### 1.   State Court Decision

Petitioner presented his claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claim was denied in a reasoned decision by the Court of Appeal (<u>People v. Cartwright</u>, 2011 Cal. App. Unpub. LEXIS 8229) and in a subsequent petition for review filed with California Supreme Court. As stated earlier, "where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. at 803-04.  Accordingly, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the ineffective assistance of counsel claim, the Court of Appeal said in its opinion:

**IV. Denial of defendant's midtrial <u>Marsden</u> motion**

Defendant next contends the court should have granted the <u>Marsden</u> motion he made in the midst of trial to remove his defense counsel, Arthur Revolo, and appoint another attorney. Defendant contends Revolo was incompetent because he failed to investigate and adequately prepare the case and failed to locate certain out-of-state witnesses who were pertinent to his alibi defense.

A. <u>Marsden</u> motions

We begin with the well-settled rules for a <u>Marsden</u> motion. "In [<u>Marsden</u>], we held that a defendant is deprived of his constitutional right to the effective assistance of counsel when a trial court denies his motion to substitute one appointed counsel for another without giving him an opportunity to state the reasons for his request. A defendant must make a sufficient showing that denial of substitution would substantially impair his constitutional right to the assistance of counsel [citation], whether because of his attorney's incompetence or lack of diligence [citations], or because of an irreconcilable conflict [citations]. We require such proof because a defendant's right to appointed counsel does not include the right to

demand appointment of more than one counsel, and because the matter is generally within the discretion of the trial court. [Citation.]" (<u>People v. Ortiz</u> (1990) 51 Cal.3d 975, 980, fn. 1.)

On appeal, we review a trial court's decision denying a <u>Marsden</u> motion to relieve appointed counsel under the deferential abuse of discretion standard. (<u>People v. Earp</u> (1999) 20 Cal.4th 826, 876.) "To the extent there was a credibility question between defendant and counsel at the [<u>Marsden</u>] hearing, the court was 'entitled to accept counsel's explanation.' [Citation.]" (<u>People v. Smith</u> (1993) 6 Cal.4th 684, 696.)

Defendant's appellate arguments are based on the trial court's denial of a <u>Marsden</u> motion made during the evidentiary portion of his jury trial. In order to evaluate his contentions, however, defendant's midtrial motion must be considered in context of the numerous <u>Marsden</u> motions he filed prior to, during, and after trial, to explain why his appellate contentions are meritless.

B. Defendant's pretrial motions

In February 2009, the complaint was filed against defendant and the court appointed Alvin Kathka to represent him. Thereafter, in February and March 2009, defendant filed <u>Marsden</u> motions and claimed Kathka failed to meet with him at the jail, that he represented someone who was going to be a witness in another case involving Kimberly, and that he was going to be "railroaded." At the <u>Marsden</u> hearings, Kathka explained his other client had no connection to defendant, Kimberly, or this case. The court found no conflict and denied the motions.

On March 6, 2009, the court granted defendant's motion to represent himself pursuant to <u>Faretta v. California</u> (1975) 422 U.S. 806 (<u>Faretta</u>). The trial was continued because defendant filed numerous pretrial discovery and evidentiary motions. In one motion, defendant declared that Kimberly would not be available to appear or testify at trial, and the voicemail recording was inadmissible hearsay in the absence of her trial testimony.

On May 5, 2009, defendant's trial was scheduled to begin, but he requested assistance from advisory counsel. On May 6, 2009, defendant told the court he was ill and unable to represent himself. The court continued the matter for a few days. On May 18, 2009, the court granted defendant's motion to withdraw his <u>Faretta</u> status. On May 20, 2009, the court appointed Michael Lukehart to represent defendant and continued the trial to July 2009.

On July 29, 2009, defendant filed a <u>Marsden</u> motion to relieve Lukehart because of an alleged conflict based on Lukehart's prior representation of Richard Arvizu in a capital case. Defendant insisted that Arvizu was the person who burned Kimberly, and Lukehart was going to "railroad" him because he used to represent Arvizu.

The court asked Lukehart about the potential conflict. Lukehart confirmed that he represented Arvizu in his dismissed capital case. Lukehart had just learned that defendant was going to claim that Arvizu was the person who burned Kimberly, and Lukehart was concerned there might be a conflict with defendant's case.

30

The court reviewed defendant's prior motions and said it was "clear" that defendant would "do or say anything you can to keep from going to trial." "You are going through attorneys. Every time it comes up to trial, for some reason, you get rid of an attorney. You seem to have an opportunity to put this over in hopes that the victim won't show up to testify." However, the court granted defendant's Marsden motion because it respected Lukehart's concern about a possible conflict.

The court appointed Arthur Revolo to represent defendant and granted his motion to continue the trial to August 31, 2009.

### C. Further pretrial motions

On August 21, 2009, Revelo filed a motion for continuance and declared that he needed more time to find "critical" out-of-state witnesses. The motion did not clarify the identity of these witnesses or why their testimony would be critical.

On August 26 and 31, 2009, the court found good cause and trailed the matter to September 14, 2009, to give defense counsel more time.

On September 14, 2009, the court called the matter for trial. Revolo stated the defense was not ready, the defense investigator was still looking for certain out-of-state witnesses, and there was not enough time to bring in those witnesses. Revolo requested another continuance and stated that defendant would waive time. The prosecutor opposed any further continuances because the defense had failed to explain why these witnesses were critical.

The court denied the continuance motion "without further indication as to the progress or the likelihood of reasonable progress within a definitive period of time ...." Revolo replied that they had located a few witnesses, but they were in California state prisons and there wasn't enough time to procure their appearance in court. The court denied the continuance motion based on the state of the record.

On September 17, 2009, the jury was sworn for defendant's trial.

### D. Trial motions

Defendant's appellate contentions are based on the Marsden motion he filed on September 21, 2009, in the midst of the evidentiary portion of his trial, to remove Revolo and appoint another attorney. The court conducted a hearing and defendant gave a history of his prior Marsden motions. Defendant claimed that Lukehart was removed because he failed to investigate the case, he was busy with other murder trials, and he failed to track down defendant's alibi witnesses, Rashawna Jones in Texas and Mimi Moten in Oklahoma.[fn4]

**FN4**: Defendant's account of his Marsden motion against Lukehart is refuted by the record, since his complaints were exclusively based on the claim that Lukehart's prior representation of Richard Arvizu created a conflict with representing defendant.

As for Revolo, defendant complained he failed to meet with him in jail, failed to investigate, was not prepared for the trial, and failed to find the out-of-state alibi witnesses. Defendant conceded that Revolo had done a "pretty good" job during the trial but claimed Revolo wasn't prepared to introduce evidence about Richard Arvizu's capital murder case – in which he burned other "adult entertainment" workers – to show that Arvizu was responsible for Kimberly's burns.

Revolo advised the court that he filed the pretrial continuance motion because he did not have enough time to prepare after he was appointed to represent defendant. Revolo confirmed he had a hard time finding witnesses, and argued defendant's due process rights were violated by being forced to proceed with the trial when defense counsel was not ready.

The court asked Revolo about the witnesses in Texas and Oklahoma. Revolo said the defense investigator could not contact the out-of-state witnesses and there was not enough time to subpoena them. Defendant said his family had provided telephone numbers for the two out-of-state witnesses, but both women had child-care issues, it was "hard on them because like they changing their numbers," and one witness "never sit[s] still long enough" and "if you can't catch her right from the moment, then, you got to start all over again."[fn5]

**FN5**: Defendant also complained that it was unfair for the prosecutor to hold "my girl Kim" in custody prior to trial, and he was sure that she was not going to run away. Defendant quizzically added that "*[i]f that is me on the tape* ... I'm going to need my defense so they can fully understand this situation ...." (Italics added.)

The court denied the <u>Marsden</u> motion and found Revolo was representing defendant in a competent manner and there was no breakdown in the attorney/client relationship. The court found defendant's dissatisfaction was based on circumstances beyond his control, and it had nothing to do with Revolo's representation.

"Specifically, as it relates to the location of these two witnesses that [defendant] is aware of, they — according to [defendant] would be in a position to be favorable to him and they are either avoiding [defendant], the process of service, or the contact in this particular matter based on his own description."

Thereafter, the trial resumed. On September 24, 2009, the jury found defendant not guilty of attempted murder and guilty of the other charged offenses.

E. Posttrial motions

While defendant's appellate contentions are based on the court's denial of his midtrial <u>Marsden</u> motion, we must also examine defendant's posttrial <u>Marsden</u> motion and the subsequent proceedings, which, as we will explain post, refute defendant's claims of prejudicial error.

On October 5, 2009, Revolo filed a defense motion for new trial and

argued the court should have granted his motion for a continuance to find various out-of-state witnesses to support defendant's alibi.[fn6]

**FN6**: In support of the new trial motion, defendant filed a declaration from Mercedes Clark of Bakersfield, who declared that she was unable to testify at defendant's trial because she was never served "with a proper subpoena," she played "phone tag" with the defense investigator, and she had child care problems. Clark declared that she would have testified that Kimberly and defendant were out of town on January 22, 2009 (the day that Sheila received the voicemail recording), Clark stayed at their Bakersfield apartment, and Sheila showed up and walked out with something in a paper bag. Defendant did not file any declarations from the other purported alibi witnesses.

On October 23, 2009, defendant filed another <u>Marsden</u> motion for removal of Revelo. Defendant recited a long list of issues that Revolo failed to investigate, witnesses he failed to call, and defense arguments he failed to make. Defendant again complained that Revolo failed to produce the two out-of-state witnesses, who would have testified that defendant was with them in Texas and Oklahoma during the week that Kimberly was allegedly assaulted in Bakersfield. Defendant also identified several witnesses in Kern County who would have testified that Kimberly was not at her apartment on the day she was allegedly assaulted, and that Sheila entered the apartment to remove a recording device she had attached to Kimberly's telephone.

Revolo explained that he had already filed a new trial motion based on the court's refusal to continue the trial so he could locate the out-of-state witnesses. Revolo said he had done everything possible to find the two witnesses prior to trial because they provided defendant with an alibi, but he did not have enough time.

The court decided to grant the <u>Marsden</u> motion and appointed another attorney to investigate defendant's allegations of ineffective assistance and determine whether another new trial motion should be filed based on Revolo's alleged failure to investigate and prepare for the case. The court appointed Brian McNamara to represent defendant and granted numerous continuances for McNamara to obtain trial transcripts and fully research possible new trial issues.

On May 28, 2010, over six months after Revolo was removed from the case, the court convened the sentencing hearing. Defendant was represented by McNamara, who noted that the new trial motion previously filed by Revolo was still before the court. McNamara stated that he was withdrawing that motion after "full consultation" with defendant, and they were not filing another motion for new trial. Thereafter, the court addressed defendant's sentencing arguments and imposed the sentence.

F.    Analysis

Defendant argues the court should have granted the midtrial <u>Marsden</u> motion he made on September 21, 2009, because Revolo was prejudicially ineffective, he failed to investigate the case, and he failed to secure the attendance of alibi witnesses. Defendant points out that at the midtrial <u>Marsden</u> hearing, Revolo argued that he had insufficient time to prepare for the case and subpoena witnesses. Defendant argues that

Revolo's "admissions," together with defendant's own "unchallenged allegations," established that his due process rights were violated when the court denied the midtrial <u>Marsden</u> motion because of Revolo's failure to prepare.

We find the court did not abuse its discretion, and defendant did not suffer any prejudice from the denial of defendant's midtrial <u>Marsden</u> motion. While both defendant and Revolo complained at that hearing about insufficient time to prepare, Revolo adequately introduced evidence about both of defendant's defense theories – that Richard Arvizu may have been responsible for burning Kimberly, and that defendant was not in Bakersfield at the time Kimberly suffered the burns.

As for Arvizu's alleged culpability, Haliki Green testified for the defense about Kimberly's involvement with Arvizu. He was present when they filmed a pornographic video, and Arvizu was a rough operator and "burning" could have occurred. Kimberly also testified that Arvizu may have burned her. Of course, Kimberly's trial testimony on this point suffered from severe credibility problems given her wildly inconsistent stories about the origin of the voicemail recording and how she was burned.

Revolo also presented defendant's alibi defense through the testimony of Timothy Harlston, who claimed that he was at defendant's apartment on the day of the alleged assault, that "Mercedes" was there and said that Kimberly was out of town, that he never saw defendant or Kimberly there, and that Sheila took something out of the apartment.

Defendant asserts that his <u>Marsden</u> motion should have been granted because of Revolo's failure to find the two out-of-state alibi witnesses who would have supported his alibi. Defendant's contentions on these points are refuted by the posttrial history of this case, including defendant's failure to file a new trial motion based on Revolo's alleged ineffective assistance. As we have explained, the court granted defendant's posttrial <u>Marsden</u> motion and appointed another attorney, McNamara, to investigate possible ineffective assistance and new trial issues, particularly as to whether Revolo should have produced certain alibi witnesses. Revolo had already filed a motion for new trial based on the court's refusal to grant a continuance to find the out-of-state witnesses. Revolo's new trial motion remained pending with the court while McNamara made numerous continuance motions, requested and obtained the lengthy trial and <u>Marsden</u> hearing transcripts, and declared he was investigating certain matters pursuant to preparing a new trial motion.

At the sentencing hearing, which was held over six months after McNamara's appointment, McNamara appeared with defendant and informed the court that after "full consultation" with defendant, and "talking with [defendant] out at the jail several times," the defense was withdrawing the new trial motion which had been filed by Revolo. McNamara further stated that the defense was not going to file another new trial motion, and did not raise any ineffective assistance issues.

In order to establish ineffective assistance based on an alleged failure to investigate, a defendant "must prove that counsel failed to make particular investigations and that the omissions resulted in the denial of or inadequate presentation of a potentially meritorious defense. [Citation.] In

1
2

particular, [the defendant] must show that counsel knew or should have known that further investigation was necessary and must establish the nature and relevance of the evidence that counsel failed to present or discover." (In re Sixto (1989) 48 Cal.3d 1247, 1257.)

3
4
5
6
7
8

Given the entirety of the record, including the posttrial history of this case, there is no evidence that defendant suffered any prejudice from the court's denial of his midtrial Marsden motion based on Revolo's alleged failure to prepare, investigate, and/or present alibi witnesses. Revolo introduced evidence about defendant's alleged alibi and Arvizu's purported culpability. McNamara had ample time to investigate the allegations defendant made at the posttrial Marsden hearing, about Revolo's alleged ineffective assistance and failure to locate the purported out-of-state alibi witnesses. Nevertheless, defendant concurred with the decision to withdraw the pending new trial motion and not to file another one.

9
10
11
12

Defendant has not challenged McNamara's posttrial investigation of his case, McNamara's decision to withdraw Revolo's new trial motion, or McNamara's decision not to file any ineffective assistance and/or new trial motions based on Revolo's alleged failure to investigate or produce the alleged alibi witnesses. The absence of posttrial motions on these matters necessarily refutes defendant's claim that Revolo was not prepared to represent him or that he suffered any prejudice from the court's denial of his midtrial Marsden motion.[fn7]

13
14
15

**FN7**: Defendant separately contends that his convictions must be reversed because of cumulative errors based on the contentions raised in issues I through IV. Given our rejection of these contentions, we further reject his assertions about cumulative error.

16

People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229.

17

2.    Law Applicable to Ineffective Assistance of Counsel Claims

18
19
20
21

While there is no clearly established Supreme Court law regarding whether the failure to grant a motion to substitute counsel violates Petitioner's constitutional rights, the claim encompasses Petitioner's claim that his right to effective assistance of counsel was violated.

22
23
24
25
26
27
28

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the Court must consider two factors. Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that

1   he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.

2   Strickland, 466 U.S. at 687.  The petitioner must show that counsel's representation fell

3   below an objective standard of reasonableness, and must identify counsel's alleged acts

4   or omissions that were not the result of reasonable professional judgment considering

5   the circumstances.  Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348

6   (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential. A court

7   indulges a strong presumption that counsel's conduct falls within the wide range of

8   reasonable professional assistance.  Strickland, 466 U.S. at 687; see also, Harrington v.

9   Richter, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).

10        Second, the petitioner must demonstrate that "there is a reasonable probability

11  that, but for counsel's unprofessional errors, the result ... would have been different."

12  Strickland, 466 U.S. at 694.  Petitioner must show that counsel's errors were "so serious

13  as to deprive defendant of a fair trial, a trial whose result is reliable."  Id. at 687.  The

14  Court must evaluate whether the entire trial was fundamentally unfair or unreliable

15  because of counsel's ineffectiveness.  Id.; Quintero-Barraza, 78 F.3d at 1348; United

16  States v. Palomba, 31 F.3d 1456, 1461 (9th Cir. 1994).

17        A court need not determine whether counsel's performance was deficient before

18  examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.

19  Strickland, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any

20  deficiency that does not result in prejudice must necessarily fail.  However, there are

21  certain instances which are legally presumed to result in prejudice, e.g., where there has

22  been an actual or constructive denial of the assistance of counsel or where the State has

23  interfered with counsel's assistance.  Id. at 692; United States v. Cronic, 466 U.S., at

24  659, and n. 25 (1984).

25        As the Supreme Court reaffirmed recently in Harrington v. Richter, meeting the

26  standard for ineffective assistance of counsel in federal habeas is extremely difficult:

27        The pivotal question is whether the state court's application of the
    Strickland standard was unreasonable. This is different from asking
28      whether defense counsel's performance fell below Strickland's standard.

1

2

3

4

5

Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a <u>Strickland</u> claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), "an unreasonable application of federal law is different from an incorrect application of federal law." <u>Williams</u>, supra, at 410, 120 S. Ct. 1495, 146 L. Ed. 2d 389. A state court must be granted a deference and latitude that are not in operation when the case involves review under the <u>Strickland</u> standard itself.

6

7

8

9

10

11

A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664, 124 S. Ct. 2140, 158 L. Ed. 2d 938 (2004). And as this Court has explained, "[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." <u>Ibid.</u> "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by this Court." <u>Knowles v. Mirzayance</u>, 556 U.S. 111, 129 S. Ct. 1411, 1419, 173 L. Ed. 2d 251, 261 (2009) (internal quotation marks omitted).

12   <u>Harrington v. Richter</u>, 131 S. Ct. at 785-86.

13   "It bears repeating that even a strong case for relief does not mean the state

14   court's contrary conclusion was unreasonable." <u>Id.</u> at 786. "As amended by AEDPA, §

15   2254(d) stops short of imposing a complete bar on federal court relitigation of claims

16   already rejected in state proceedings." <u>Id.</u> "As a condition for obtaining habeas corpus

17   from a federal court, a state prisoner must show that the state court's ruling on the claim

18   being presented in federal court was so lacking in justification that there was an error

19   well understood and comprehended in existing law beyond any possibility for fairminded

20   disagreement." <u>Id.</u> at 786-87.

21   Accordingly, even if Petitioner presents a strong case of ineffective assistance of

22   counsel, this Court may only grant relief if no fairminded jurist could agree on the

23   correctness of the state court decision.

24          3.   <u>Analysis</u>

25   The state court, in denying the claim applied the appropriate federal standard for

26   ineffective assistance of counsel under Strickland and found that Petitioner did not

27   establish that he was prejudiced by the actions of counsel. In this case, Petitioner

28   contends that counsel failed to investigate and procure two out of state witnesses that

1    could have testified that Petitioner was not with the victim at the time of the assault.

2        Petitioner contends that counsel was ineffective for failing to find and present two

3 female witness, one from Texas, and one from Oklahoma, to testify in his defense. Trial

4 counsel requested continuances of the trial date to procure the witnesses, but his

5 investigator was unable to locate the witnesses. Petitioner acknowledged that even if the

6 witnesses could be found, it would be difficult for them to testify due to child care issues,

7 and that one of the witnesses was likely not capable of sitting through questioning.

8        "Although trial counsel is typically afforded leeway in making tactical decisions

9 regarding trial strategy, counsel cannot be said to have made a tactical decision without

10 first procuring the information necessary to make such a decision." <u>Reynoso v. Giurbino</u>,

11 462 F.3d 1099, 1112 (9th Cir. 2006); <u>Cannedy v. Adams</u>, 706 F.3d 1148, 1162 (9th Cir.

12 2013). While a failure to perform an adequate investigation can be a basis for deficient

13 performance under <u>Strickland</u>, Petitioner has not shown that he is entitled to relief with

14 regard to this claim.

15        Based on the representations of defense counsel, counsel and his investigator

16 requested and obtained continuances of trial to provide more time to locate the

17 witnesses, but ultimately could not reach the witnesses. Petitioner has not shown that he

18 was prejudiced by counsel's conduct. From the record, it appears that counsel engaged

19 in appropriate discovery regarding the out of state witnesses, but despite reasonable

20 efforts was unable to locate them. Regardless, counsel presented other alibi witnesses.

21 One testified that neither Petitioner nor the victim were present at the victim's apartment

22 on the date of the alleged assault. Another witness, and the victim herself, testified that

23 that the victim may have been burned her during the course of a pornographic video

24 shoot.

25        The finding of the state court that Petitioner was not prejudiced by the actions of

26 counsel is reasonable. Counsel attempted to find the out of state witness, but was

27 unable to locate them. At trial, counsel presented other witnesses that presented

28 testimony to refute that Petitioner was with the victim at the time of the assault and

1   provided a plausible alternative explanation for the burns. Finally, after trial, the court

2   provided Petitioner new counsel, and granted Petitioner several continuances while the

3   new counsel researched the case to determine whether there was any basis for filing the

4   motion for a new trial. After investigation, counsel withdrew the motion for a new trial.

5   Based on the evidence presented, Petitioner has not shown that it would have been

6   possible to find the witnesses, or that the result of the trial would have been different with

7   their testimony. Despite the testimony of alibi witnesses at trial, the jury found the weight

8   of the prosecution's evidence enough to support finding Petitioner guilty of most of the

9   charged offenses.

10      Petitioner has not met his burden of showing that but for counsel being ineffective,

11   there was a "reasonable probability that... the result ... would have been different."

12   Strickland, 466 U.S. at 694. The prosecution presented strong evidence of Petitioner's

13   guilt based on the phone recording of the incident and the testimony and photographic

14   evidence of the burn injuries.

15      Based on the strong evidence presented of Petitioner's involvement in the crime

16   of conviction, it is unlikely that jurors would have not found Petitioner guilty if his counsel

17   would have procured the out of state witnesses and presented their testimony at trial.

18   Fairminded jurists could therefore disagree with the correctness of the state court

19   decision that counsel's failure to object to the admission of the testimony as not "so

20   serious as to deprive defendant of a fair trial, a trial whose result is reliable." Strickland,

21   466 U.S. at 687. Petitioner's claim of ineffective assistance of counsel is without merit.

22      **E.   Claim Five: Cumulative Error**

23      Petitioner, in his fifth claim, contends that the cumulative effect of the errors at trial

24   violated his rights.

25          1.   State Court Decision

26      Petitioner presented his claim by way of direct appeal to the California Court of

27   Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the

28   Court of Appeal (People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229) and in a

subsequent petition for review filed with California Supreme Court. As stated earlier, "where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the claim rest on the same grounds." See Ylst v. Nunnemaker, 501 U.S. at 803-04. Accordingly, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the cumulative error claim, the Court of Appeal said in its opinion:

> Defendant separately contends that his convictions must be reversed because of cumulative errors based on the contentions raised in issues I through IV. Given our rejection of these contentions, we further reject his assertions about cumulative error.

People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229, n.7.

2.      Analysis

The Ninth Circuit has concluded that under clearly established United States Supreme Court precedent, the combined effect of multiple trial errors may give rise to a due process violation if it renders a trial fundamentally unfair, even where each error considered individually would not require reversal. Parle v. Runnels, 505 F.3d 922, 927 (9th. Cir. 2007) (citing Donnelly v. DeChristoforo, 416 U.S. 637, 643, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974) and Chambers v. Mississippi, 410 U.S. 284, 290, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973)). See also Hayes v. Ayers, 632 F.3d 500, 524 (9th Cir. 2011) (if no error of constitutional magnitude occurred at trial, "no cumulative prejudice is possible"). "The fundamental question in determining whether the combined effect of trial errors violated a defendant's due process rights is whether the errors rendered the criminal defense 'far less persuasive,' Chambers, 410 U.S. at 294, and thereby had a 'substantial and injurious effect or influence' on the jury's verdict." Parle, 505 F.3d at 927 (quoting Brecht, 507 U.S. at 637).

This Court has addressed each of Petitioner's claims raised in the instant petition and has concluded that no error of constitutional magnitude occurred at his trial in state court. This Court also concludes that the errors alleged by Petitioner, even when

considered together, did not render his defense "far less persuasive," nor did they have a "substantial and injurious effect or influence on the jury's verdict." Accordingly, Petitioner is not entitled to relief on his claim of cumulative error.

### F. Claim Six: Consecutive Sentences

Petitioner, in his sixth claim, contends that the trial court erred by denying his motion to bifurcate the trial with regard to the gang enhancements. (Pet. at 17.)

#### 1. State Court Decision

Petitioner presented his claim by way of direct appeal to the California Court of Appeal, Fifth Appellate District. The claims were denied in a reasoned decision by the Court of Appeal (People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229) and in a subsequent petition for review filed with California Supreme Court. Since the Court of Appeal was the last court to issue a reasoned opinion on these issues, this Court "looks through" the California Supreme Court decision to the reasoned analysis of the Court of Appeal.

With regard to the cumulative error claim, the Court of Appeal said in its opinion:

**VI. Sentencing issues**

Defendant was sentenced to 14 years to life for count II, torture, plus a consecutive term of five years for the prior serious felony enhancement. The court imposed a concurrent term for count V, criminal threats. Defendant contends the court should have granted his motion to stay the term imposed for count V pursuant to section 654, because counts II and V occurred during a single course of conduct, and he had the same intent when he committed the offenses of torture and criminal threats.

A. Background

The probation report recommended the imposition of consecutive sentences for count II, torture, and count V, criminal threats, because the crimes involved separate acts of violence or threats of violence.

At the sentencing hearing, defense counsel argued the sentence for criminal threats should be stayed pursuant to section 654. Defense counsel argued the acts constituting torture and criminal threats occurred during a single course of conduct, with a single intent during the entire episode to frighten, threaten, and harm the victim. Counsel noted that defendant threatened and burned the victim at the same time, so that he was acting on and carrying out the criminal threats during the torture.

The prosecutor argued the voicemail recording showed that defendant separately threatened to harm Kimberly if she was not faithful to him, and those threats were independent of the assault and torture with the iron. The prosecutor asserted that while the convictions were based on one chronological incident, the threats and torture were separate events committed with separate intents.

The court asked the parties to address whether consecutive sentences were appropriate because the crimes involved separate acts of violence and/or threatened offenses. The court asked defense counsel if it determined that section 654 was "inapplicable to Count 5, won't you want to be making an argument that it should not be consecutively added to the torture charge, should be sentenced concurrent with the torture charge?" Defense counsel agreed that the court should impose a concurrent term for count V if it rejected his section 654 argument.

The court made the following findings as to count V, criminal threats:

> "As to the consecutive versus concurrent sentencing, the grounds cited for consecutive sentence is the fact that the crimes involved separate acts of violence or threats of violence that does not necessarily require temporal separation, but separate acts.

> "However, in this particular circumstance[] and as particularly demonstrated by the tape record — or the recording that was played, the threats of violence that were made were made at the same time and, as far as this court is concerned, in the same course of conduct applying torture to the victim and physical harm to the victim and emotional harm to the victim, all of which are the objects of the torture count.

> "*So the court is not going to sentence consecutively as to Count 5 ....*" (Italics added.)

The court imposed the second strike sentence of 14 years to life for count II, torture, plus a consecutive term of five years for the prior serious felony enhancement. The court imposed a concurrent term for count V, criminal threats. As to counts III, assault with a deadly weapon, and count IV, infliction of corporal injury, the court stayed the terms and enhancements imposed pursuant to section 654. The court did not make any express findings as to why it did not stay the term imposed for count V.

B. Analysis

"Section 654 applies when there is a course of conduct which violates more than one statute but constitutes an indivisible transaction. [Citation.] The purpose of section 654 is to ensure that a defendant's punishment will be commensurate with his culpability. [Citation.] Whether a course of criminal conduct is a divisible transaction which could be punished under more than one statute within the meaning of section 654 depends on *the intent and objective of the actor*. [Citation.]" (People v. Saffle (1992) 4 Cal.App.4th 434, 438, italics added.) "'If all of the offenses

were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' [Citation.]" (People v. Britt (2004) 32 Cal.4th 944, 951-952.)

The sentencing court's factual findings as to whether section 654 applies, and whether there was more than one objective, will not be reversed on appeal if there is any substantial evidence to support those findings. (People v. Jones (2002) 103 Cal.App.4th 1139, 1143; People v. Saffle, supra, 4 Cal.App.4th 434, 438.) This includes the court's implied findings. (People v. Nguyen (1988) 204 Cal.App.3d 181, 190.)

While the court in this case did not make an express finding as to section 654, there is substantial evidence to support its implied finding that section 654 did not apply to stay the sentence imposed for count V, criminal threats. The court clearly considered defense counsel's arguments about section 654, but asked counsel to consider the alternative argument as to whether concurrent sentences were appropriate if the court rejected the section 654 issue. Given those statements, the court understood the scope of its discretion pursuant to section 654.

When the court imposed the sentence for count V, it rejected the probation report's recommendation for consecutive terms and instead found the torture and criminal threats were inflicted during the same course of conduct and a concurrent term was more appropriate.[fn8]

FN8: California Rules of Court, rule 4.425 lists a number of factors the court may consider in determining whether a sentence should be concurrent or consecutive, including whether the crimes involved separate acts of violence and whether they were committed at different times. (Cal. Rules of Court, rule 4.425(a)(2), (3).)

The court's implied finding, that count V should not be stayed pursuant to section 654, is supported by substantial evidence because defendant had separate intents and objectives when he committed the offenses of torture and criminal threats. Kimberly told Officer Pence that the incident began when she received a telephone call from a former boyfriend. During the voicemail recording, Kimberly pleaded with defendant not to burn her with the iron, and defendant repeatedly accused her of cheating on him, threatened to kill her, and warned her not to fool around on him. Even though defendant threatened Kimberly as he was burning her, his criminal threats were intended to control Kimberly's future conduct and make sure she did not cheat on him again, whereas he burned her with the iron to punish her for what he perceived as her alleged infidelity with the former boyfriend.

People v. Cartwright, 2011 Cal. App. Unpub. LEXIS 8229 at 47-53.

2.    Legal Standard

"The decision whether to impose sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus." Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994); accord. Souch v.

1   Schaivo, 289 F.3d 616, 623 (9th Cir. 2002) ("because the trial court actually had

2   absolute discretion to impose either consecutive or concurrent sentences[,] ... neither an

3   alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the

4   trial court's alleged failure to list reasons for imposing consecutive sentences, can form

5   the basis for federal habeas relief." (emphasis omitted)); see also Oregon v. Ice, 555

6   U.S. 160, 129 S. Ct. 711, 172 L. Ed. 2d 517 (2009) (no Apprendi error if a judge

7   determines to impose consecutive sentences in lieu of the jury).

8              3.     Analysis

9          Petitioner contends that he was improperly sentenced, and that the sentence for

10   criminal threats should have been stayed, rather than made to run concurrent with his

11   other sentence.

12         Petitioner argues that the evidence in the case supports a finding that the crimes

13   were conducted during a single course of conduct, and the resulting sentence for

14   criminal threats should be stayed. Petitioner's argument that it was one continuous

15   episode is solely based on an interpretation of California's sentencing law, and,

16   therefore, his claim cannot be reviewed by a federal court on a petition for habeas

17   corpus. See Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385

18   (1991) ("it is not the province of a federal habeas court to reexamine state-court

19   determinations on state-law questions."). Even if this Court could review this claim, there

20   was no error by the California court as there was sufficient evidence to support the

21   consecutive sentences based on Petitioner's separate actions of threats and torture

22   against the victim. Therefore petitioner's claim is denied.

23

24   **IV.    RECOMMENDATION**

25         Accordingly, it is hereby recommended that the petition for a writ of habeas

26   corpus be DENIED with prejudice.

27         This Findings and Recommendation is submitted to the assigned District Judge,

28   pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty (30) days after

being served with the Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Any reply to the objections shall be served and filed within fourteen (14) days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014).

IT IS SO ORDERED.

Dated:   March 14, 2016        /s/ Michael J. Seng

UNITED STATES MAGISTRATE JUDGE